UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CLIFFTON AMERSON SHULTZ,

    Defendant.
                             /

Case No. 08-20020

Sean F. Cox
United States District Judge

Michael Hluchaniuk
United States Magistrate Judge

# REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS

**I.    PROCEDURAL HISTORY**

On January 24, 2008, defendant Cliffton Amerson Shultz was indicted and charged with one count of being a felon in possession of a firearm on November 26, 2007. (Dkt. 3). Defendant filed a motion to suppress evidence on April 11, 2008, alleging that the search by law enforcement officers of defendant's vehicle on November 26, 2007 violated his constitutional rights and that the resulting seizure of evidence and any derivative evidence should be suppressed. (Dkt. 12).

In response to defendant's motion, the government claims that there was "probable cause to stop defendant's vehicle for the civil infraction of obstructing traffic" on November 26, 2007 and, therefore, the stop of defendant's vehicle was

proper. (Dkt. 15). The government further claims that, when the officers approached defendant's vehicle following the stop, they observed an open container of alcohol and arrested defendant for operating a vehicle with open intoxicants in the vehicle. *Id.* The ensuing search of the vehicle resulted in the seizure of the firearm for which defendant is charged with unlawful possession.

On May 16, 2008, this motion was referred to the undersigned by the District Court for a report and recommendation pursuant to [28 U.S.C. § 636(b)(1)(B)](). (Dkt. 16). Based on that referral, an evidentiary hearing was held on June 12, 2008. Following the hearing, a transcript of the testimony was prepared. (Dkt. 19, transcript of June 12, 2008 hearing (hereinafter "Hrg. Tr.")). The parties filed supplemental memoranda on August 8, 2008 reflecting their respective positions based on the testimony at the hearing. (Dkt. 21, 22).

## II. STATEMENT OF FACTS

The government presented two witnesses during the hearing. The first witness was Flint Police Officer Jeremy Beisel. Officer Beisel testified that he was working in the City of Flint on November 26, 2007, on patrol and in full uniform. (Hrg. Tr., 6). At about 9:00 p.m., Officer Beisel was parked on Industrial Avenue next to another marked police vehicle occupied by Flint Police

Officer Matthew Wilson. (Hrg. Tr., 7).[1] According to Officer Beisel, both police vehicles were side-by-side on Industrial Avenue facing north, south of Bundy with his vehicle closest to the east side of the street. (Hrg. Tr., 14). Officer Beisel observed a white Bonneville approach the area and stop on Industrial Avenue and remain there for 2-3 minutes. (Hrg. Tr., 7-8). While the white Bonneville was stopped on Industrial Avenue, two other vehicles traveling north on Industrial Avenue went around it and a man approached the vehicle on the passenger side, appearing to speak with the driver. (Hrg. Tr., 8).[2] Officer Beisel described the area as residential with curbs on both sides of the street. (Hrg. Tr., 9).

After observing the white Bonneville, the officers decided to stop it because, in their view, the driver had committed the civil infraction of "obstructing traffic." (Hrg. Tr., 9). The white Bonneville had begun to move from its initial

---

[1] According to the maps admitted as evidence in this case Industrial Avenue runs north and south and is intersected by four streets relevant to this case. The southernmost street is E. Alma with E. York being the next street to the north followed by E. Bundy and then E. Carpenter. (*See* Defendant's Exhibit 1, attached as Appendix 1).

[2] In his supplemental brief, defendant attempts to impeach the testimony of Officer Beisel with a police report of the incident, which contains some inconsistency with his hearing testimony. (Dkt. 21, Ex. 3). However, that report was not admitted as evidence during the hearing or acknowledged by the witness and, therefore, in the absence of a stipulation allowing its admission post-hearing, it would be improper to use the document for any purpose.

position before it stopped as a result of the police cars coming up behind it with the flashing lights on. When the officers approached the white Bonneville, they observed a half-full 12 ounce bottle of Corona beer between the driver's legs. (Hrg. Tr., 10). The driver, defendant in the present case, was placed under arrest. (Hrg. Tr., 10). Officer Beisel conducted a search of defendant's person, finding marijuana in his waistband and pocket, while Officer Wilson searched the vehicle. (Hrg. Tr., 11).

On cross-examination, Officer Beisel said that the white Bonneville had been heading east on York Street and turned north onto Industrial Avenue before stopping north of Bundy and south of Carpenter. (Hrg. Tr., 15-16). Officer Beisel said that he had spoken to the man who had approached the white Bonneville prior to the traffic stop but could neither remember where he had spoken with him nor very many details of the man's appearance. (Hrg. Tr., 17). The driver was initially approached regarding "obstructing the flow of traffic," which the officer said was a violation of both state law and a Flint city ordinance, but no specific statute or ordinance was identified. (Hrg. Tr., 28).

The second witness called by the government was Officer Matthew Wilson. Officer Wilson said the two officers were parked along Industrial Avenue just south of York. (Hrg. Tr., 31). He described the area as residential but said that

there were no curbs on the street. (Hrg. Tr., 32). He could not recall how the police cars were parked in relation to each other, but when asked to mark their positions on a map, he indicated both cars side-by-side on Industrial Avenue with his vehicle being closest to the edge of the street. (*See* Defendant's Exhibit 2, attached as Appendix 2).

Officer Wilson said the white Bonneville was stopped when he first observed it on Industrial Avenue, indicating on defendant's exhibit 2 that it was located just north of York and south of Bundy. He observed a man approach the white Bonneville as it stood in the street and the vehicle stayed at that location for two minutes. (Hrg. Tr., 32). During those two minutes two other vehicles drove around the white Bonneville to continue their travel on Industrial Avenue. (Hrg. Tr., 36). While Officer Wilson did not recall who made the decision to stop the white Bonneville, that decision was made and the vehicle was stopped after it had moved from where it had been observed by the officers, but before it had gone past Carpenter Road. (Hrg. Tr., 32). Once stopped, Officer Wilson went to the driver's side of the vehicle, asked to see the driver's license and related documents, and then observed a half full 12 ounce Corona beer bottle between the driver's legs. (Hrg. Tr., 33). The driver, defendant in the present case, was arrested for open intoxicants and placed in handcuffs immediately. (Hrg. Tr., 34).

Officer Wilson then searched defendant's car incident to the arrest of defendant and conducted an inventory search of the vehicle pursuant to the Flint Police Department policy. (Hrg. Tr., 35). A handgun was found under the driver's seat. *Id*. Defendant was given a ticket by Officer Wilson for "obstructing traffic." (Hrg. Tr., 36). The ticket was given to defendant when he was in the cell block following the arrest. (Hrg. Tr., 44).

Defendant also presented witnesses during the hearing. Defendant testified on his own behalf and also called Waverly Trouser as a witness. Mr. Trouser testified that, in November of 2007, he lived in a residence located on the corner of York and Industrial Avenue. (Hrg. Tr., 48). He recalled an incident that had taken place at his residence during that month. The incident, as he recalled, involved a white car pulling into his driveway during one evening just as he was walking out of the house. (Hrg. Tr., 49). At the time he came out of his house, he observed two police vehicles south of the residence on Industrial Avenue near Alma. (Hrg. Tr., 51). The driver of the car that pulled into his driveway, a person he did not know, got out and came to where Mr. Trouser was standing and asked about a female that he apparently thought lived at that residence. (Hrg. Tr., 50). Mr. Trouser asked the man to leave and, shortly after the man in the white car had

left, at least two police cars pulled over the white car. (Hrg. Tr., 52). Mr. Trouser did not see what happened after that because he went back into his house. *Id.*

Mr. Trouser acknowledged that he had been drinking that evening, however, he denied being intoxicated. (Hrg. Tr., 59). He conceded that his memory might have been impaired to some degree due to his drinking, but definitely recalled the white car pulling into his driveway and definitely recalled the police pulling the car over after leaving his residence. (Hrg. Tr., 59-60).

During his testimony, defendant said that, on the night in question, he had dropped off a passenger on Alma Street near Industrial Avenue, where he had observed two police vehicles, and then proceeded to drive north on Industrial Avenue until he came to the house where he recalled previously dropping off a female that he apparently was interested in seeing again. (Hrg. Tr., 63-64). Defendant had seen the police again on a "side street" before arriving at the house. (Hrg. Tr., 66). He stopped at the house and, after he was told by a person (in court he identified Waverly Trouser as the person he spoke to) that the female did not live there, defendant left. (Hrg. Tr., 64). Defendant said that he was at the residence for less than one minute. (Hrg. Tr., 70). Shortly after pulling away from the house, he was stopped by Officers Wilson and Beisel. (Hrg. Tr., 67). Defendant denied having an open bottle of beer between his legs but

acknowledged there was an unopened bottle of beer on the floor of the car at the time he was stopped. (Hrg. Tr., 69). He said that he was placed under arrest and taken to one of the police cars where he was given a ticket for open intoxicants and was told he would be released unless something was found in his car. (Hrg. Tr., 67-68). When asked by one of the officers if he had anything on him, he admitted that he had marijuana on his person. Defendant denied that the officers had found any marijuana on him during the search of his person before he had informed them of having it. (Hrg. Tr., 68).

Defendant was taken to a lock-up facility and made a written statement. (Hrg. Tr., 72). In that written statement, defendant said, among other things, that he had dropped off a friend on Alma Street and, while he was parked there, the "police rolled by" him. He also said that he left that location and turned the "same way the police went" and then pulled into a driveway "next" to where the "police were talking" to find "another girl." He said that he asked a man about the girl and received a negative response so he drove away and was then stopped by the police after driving "a little way." (*See* Government's Exhibit A, attached as Appendix 3).

## III. ANALYSIS

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court determined that it was proper in a Fourth Amendment sense for a police officer to stop and question individuals where the officer had a *reasonable suspicion* that the individuals were engaged in or about to be engaged in criminal activity. The Court generally described such police conduct as "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Id*. at 20. This determination came with a standard that required the police officer to have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" stopping the suspect and making an inquiry. *Id*. at 21. The standard was also deemed to be an objective one such that the facts would have to warrant a person of "reasonable caution" to believe that the action was necessary. *Id*. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme Court] has consistently refused to sanction." *Id*. at 22. These type of encounters by the police and individuals have come to be known as investigatory stops or *Terry* stops. Courts reviewing the propriety of an investigatory stop must look at the totality of the circumstances to determine if the officer had a particularized and objective basis for suspecting criminal activity.

A variation on the *Terry* stop theme is when the officers believe a traffic violation has taken place. In *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), the Court reviewed a situation in which a police officer had stopped a motor home because it had crossed the "white line separating the emergency lane from the right-hand lane of traffic for an estimated twenty to thirty feet." *Id.* at 465. The officer had stopped the motor home based on a belief that the driver had violated a specific section of the Tennessee Code requiring that a vehicle "'shall be driven as nearly as practicable entirely within a single lane.'" *Id.* Citing *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993),[3] the *Freeman* Court held that, where a police officer has probable cause to believe that a "'traffic violation has occurred or was occurring,'" the officer can lawfully stop the

---

[3]*Ferguson* involved a police officer stopping a car for not having a visible license plate. While the Court was primarily focused on determining whether the traffic stop was pretextual, it did note, citing *United States v. Pino*, 855 F.2d 357 (6th Cir. 1988), amended to add concurrence, 866 F.2d 147 (6th Cir. 1989), that the traffic stop based on probable cause was proper. *United States v. Ferguson*, 8 F.3d at 389. The *Pino* Court affirmed a district court finding that probable cause existed for the belief that the defendant had committed a traffic violation without citing case authority for that standard. Thus, it appears that the Sixth Circuit created a higher standard for stopping an individual for a traffic violation (probable cause) than the Supreme Court required for an investigatory stop for the suspicion of other criminal activity (reasonable suspicion). After *Ferguson*, the Supreme Court decided *Whren v. United States*, 517 U.S. 806, 810 (1996), in which it said that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."

vehicle. *Id*. at 466. The Court concluded that the observations of the police officer did not, as a matter of law, constitute probable cause to believe that a violation of that particular section of the Tennessee Code had taken place and, therefore, the stop of the vehicle was improper and the evidence seized in the search should be suppressed. The *Freeman* Court did not distinguish between ongoing offenses or completed offenses or whether the traffic offense was a civil infraction or a misdemeanor.

Eight years later, the Sixth Circuit, in *United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008), examined a situation in which a police officer pulled over a vehicle that allegedly did not have a license plate complying with the visibility requirements of Tennessee law. In *Simpson*, the Sixth Circuit discussed some of the confusion about whether the "reasonable suspicion" or the "probable cause" standard should be applied during traffic stops and cited several cases with inconsistent conclusions on that point: "Our circuit's case law on this issue has not been entirely clear, at least with regard to traffic violations." *Id*. at 538. While the Court expressed "grave doubts" about the viability of the probable cause standard under any circumstances, the earliest panel on the issue (*United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000)) determined that "probable cause" was required and the *Simpson* panel had no authority to overrule that decision. *Id*. at

538-40. The Court, however, distinguished the facts before it by noting that, unlike in the *Freeman* case, which involved a single isolated incident of a vehicle drifting onto the shoulder (i.e., a "completed" violation), *Simpson* involved an "ongoing" violation (a violation of statute requiring registration plate to be legible and securely fastened in visible place), for which reasonable suspicion is sufficient.[4]  The Court went on to examine a specific Tennessee Code provision relating to license plates and determined that, based on the particular language of the statute, the officer had a reasonable suspicion that the statute was violated and, therefore, the traffic stop was proper.  Approximately one month later, the Sixth Circuit again examined a situation in which a police officer stopped a motor vehicle based on a license plate violation.  *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008).  Citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004), the Court in *Blair* noted that "[t]his circuit has developed two separate tests to determine the constitutionality of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d at 748.  While the Court recognized a conflict in the circuit relating to

---

[4] While the *Simpson* court distinguished itself from *Freeman* on this basis, the *Freeman* court had found that the probable cause standard applied to traffic offenses that had occurred or were occurring.  *Simpson*, 209 F.3d at 466.

whether the proper standard for stopping a vehicle for a civil traffic violation was probable cause or reasonable suspicion, the case was decided on other grounds and, therefore, that conflict remains. *Id*. at 748, n. 2. As a result, under existing circuit precedent the standard for police officers to use in stopping a vehicle for traffic offenses differs depending on whether the offense is completed or ongoing and whether it is a civil infraction or a criminal offense.

In the present case, the government justifies the traffic stop of defendant's vehicle on November 26, 2007 by asserting that "there was probable cause to stop defendant's vehicle for the civil infraction of obstructing traffic." (Dkt. 15). The first issue to consider in evaluating the government's position is the nature of the offense for which defendant was stopped. The question of whether probable cause is the correct standard is dependent on the underlying offense. In this case, the offense for which defendant's car was stopped is unclear. Nowhere in the pleadings filed by the government, or in the evidence presented at the hearing, was a specific offense identified. Officer Beisel testified that, when the officers first approached defendant's vehicle, they were inquiring about a "civil infraction" relating to "obstructing the flow of traffic" which, according to the officer, could have been a violation of the Flint City ordinance or state statute. (Hrg. Tr., 28). In *Freeman*, *Simpson*, and *Blair,* a specific statute or ordinance was considered when

deciding whether the officers were justified in stopping the vehicle. Given the uncertainty in the Sixth Circuit relating to the proper standard for conducting traffic stops for traffic offenses, it is particularly important to identify the specific offense that the police officer relies on in making the stop. "[I]t is the responsibility of the courts to make sure that police officers act appropriately and not abuse the power legally afforded them [in stopping individuals for traffic offenses]." *United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999). A government witness testified that defendant was issued a ticket for obstructing traffic, but the ticket was not introduced into evidence and no evidence was offered as to what offense, state or local, was charged. Without the offense being identified, it is impossible to determine if there was probable cause or a reasonable suspicion that a traffic violation was committed. The government cannot sustain its burden of proof to establish the reasonableness of the officers' conduct without a showing that probable cause, or a reasonable suspicion, existed that a particular law was violated.[5]

---

[5] Given the government's burden of proof and the importance of these type of Constitutional questions, it is not appropriate for the Court to guess the traffic violation for which defendant was stopped. A review of some of the possible alternative charges merely adds to the uncertainty of the circumstances. The Flint City Code contains a section providing that "[n]o vehicle shall be allowed to remain upon or be driven over any highway so as to blockade the highway." Section 28-25. It is not clear that this was the offense the police officers were

## IV. RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that defendant's motion to suppress be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this

---

thinking about when the stopped defendant's vehicle but, if it was, it is questionable that the conduct they described suggested a violation of the offense. Under the government's theory of the case, defendant was stopped on a residential street for approximately two minutes while defendant spoke to a pedestrian who had approached his car. It is certainly questionable whether this created a "blockade" of the street when other vehicles simply drove around defendant's car to proceed. Defendant's vehicle did not seem to create a greater impediment to travel than the impediment created by the two police vehicles that were parked side-by-side on the same street. Additionally, this Code section does not appear to be a civil infraction. Section 1-11 provides that, unless a section of the code is specifically designated as a civil infraction it shall be considered a misdemeanor. Section 1-20 designates numerous sections of the code as civil infractions but § 28-25 is not included in those so designated. Further, a search of Michigan law did not reveal an offense resembling "obstruction of traffic." This difficulty in finding an offense that is applicable to these facts underscores the need for the government to make clear the particular offense for which defendant was stopped.

Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not exceed 20 pages in length unless such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections by motion and order. If the Court determines any objections are without merit, it may rule without awaiting the response to the objections.

Date: September 12, 2008    s/Michael Hluchaniuk
                            Michael Hluchaniuk
                            United States Magistrate Judge

### CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send electronic notification to the following: Nancy A. Abraham and Kenneth R. Sasse.

                            s/James P. Peltier
                            Courtroom Deputy Clerk
                            U.S. District Court
                            600 Church Street
                            Flint, MI 48502
                            (810) 341-7850
                            pete_peltier@mied.uscourts.gov