UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CLIFFTON AMERSON SHULTZ,

    Defendant.
_____/

Case No. 08-20020

Sean F. Cox
United States District Judge

Michael Hluchaniuk
United States Magistrate Judge

# SUPPLEMENTAL REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

## I. PROCEDURAL HISTORY

On January 24, 2008, defendant Cliffton Amerson Shultz was indicted and charged with one count of being a felon in possession of a firearm on November 26, 2007. (Dkt. 3). Defendant filed a motion to suppress evidence on April 11, 2008, alleging that the search by law enforcement officers of defendant's vehicle on November 26, 2007 violated his constitutional rights and that the resulting seizure of evidence and any derivative evidence should be suppressed. (Dkt. 12).

In response to defendant's motion, the government claims that there was "probable cause to stop defendant's vehicle for the civil infraction of obstructing traffic" on November 26, 2007 and, therefore, the stop of defendant's vehicle was

1

Supplemental Report and Recommendation
Defendant's Motion to Suppress
*United States v. Shultz*, No. 08-20020

proper. (Dkt. 15). The government further claims that, when the officers approached defendant's vehicle following the stop, they observed an open container of alcohol and arrested defendant for operating a vehicle with open intoxicants in the vehicle. *Id.* The ensuing search of the vehicle resulted in the seizure of the firearm for which defendant is charged with unlawful possession.

On May 16, 2008, this motion was referred to the undersigned by the District Court for a report and recommendation pursuant to [28 U.S.C. § 636(b)(1)(B)](). (Dkt. 16). Based on that referral, an evidentiary hearing was held on June 12, 2008. Following the hearing, a transcript of the testimony was prepared. (Dkt. 19, transcript of June 12, 2008 hearing (Hrg. Tr.)). The parties filed supplemental memoranda on August 8, 2008 reflecting their respective positions based on the testimony at the hearing. (Dkt. 21, 22).

Based on the testimony at the hearing and the submissions of the parties, a Report and Recommendation was filed, concluding that the motion to suppress should be granted because the government had not established that the specific offense that defendant was suspected committing, when the police officers stopped his vehicle. Without establishing the specific offense, it was thought to be impossible to determine whether the Constitutional standards for stopping the vehicle had been met. The government filed a timely objection to the Report and

Recommendation and the matter was subsequently referred back to the undersigned for the purpose of making credibility determinations regarding the factual basis of the stop of defendant's vehicle. (Dkt. 24, 25).

## II. STATEMENT OF FACTS

The initial Report and Recommendation included a fairly detailed recitation of the evidence presented at the hearing on June 12, 2008. In order to assess the weight of the evidence presented, it will be necessary to analyze the evidence in greater detail than was done in the earlier Report and Recommendation. The evidentiary analysis has been conducted under the following standards: (1) the government has the burden of proof, (2) the credibility of witnesses is determined by such factors as (a) the opportunity of the witnesses to experience the events in question, (b) could the witness accurately remember what happened, (c) the demeanor of the witness while testifying, (d) the bias or prejudice of the witness, (e) the inconsistency of the witnesses testimony, and (f) the believability of the testimony in light of the other evidence, and (3) the testimony of a law enforcement officer is not entitled to greater weight than other witnesses and is

subject to attack on the grounds that the officer's testimony may be colored by a personal or professional interest in the outcome of the case.[1]

The first government witness was Flint Police Officer Jeremy Beisel who testified that he was working in the City of Flint on November 26, 2007, on patrol and in full uniform. (Hrg. Tr. at 6). At about 9:00 p.m., Officer Beisel was parked on Industrial Avenue next to another marked police vehicle occupied by Flint Police Officer Matthew Wilson. (Hrg. Tr. at 7).[2] At first, Officer Beisel testified that the police vehicles were south of Bundy and north of York when he initially observed defendant's vehicle. (Hrg. Tr. at 13). He later said the vehicles were south of York at that time, rather than north of York. (Hrg. Tr. at 15, 26). He described the area as residential and indicated that Industrial Avenue was a two-lane street with curbs on both sides of the street. (Hrg. Tr. at 9, 28). According to Officer Beisel, both police vehicles were side-by-side on Industrial Avenue facing

---

[1] In *United States v. Lopez-Medina*, 461 F.3d 724, 744 (6th Cir. 2006), the Court approved a similar instruction relating to general law enforcement testimony while finding it inadequate when an officer testifies as a fact witness and an expert witness.

[2] According to the maps admitted as evidence in this case, Industrial Avenue runs north and south and is intersected by four streets relevant to this case. The southernmost street is E. Alma with E. York being the next street to the north followed by E. Bundy and then E. Carpenter. (*See* Defendant's Exhibit 1, attached as Appendix 1).

north. (Hrg.Tr. at 7). At first he said that Officer Wilson was parked "east" of him, placing Wilson's vehicle closest to the edge of the street, but then later said his vehicle was closest to the east, or curb side of the street. (Hrg. Tr. at 14). While saying that the street had two lanes with curbs and the police vehicles were parked side-by-side, Officer Beisel denied that Wilson's vehicle was in the middle of the street, claiming that he was "pulled off to the shoulder" without explaining how a street with curbs also had a shoulder. (Hrg. Tr. at 17).

Officer Beisel testified that he observed a white Bonneville traveling eastbound on York and turn north onto Industrial. The vehicle went north and stopped on Industrial Avenue, north of Bundy and south of Carpenter, and remain there for 2-3 minutes. (Hrg. Tr. at 7-8, 15-16). He further testified that, after the vehicle stopped, an "unidentified male black individual" came up to the passenger side of the vehicle and talked to the person inside. (Hrg. Tr. at 8, 17). Officer Beisel could give no more detailed description of the person who approached the defendant's vehicle except to later say he may have been in his "forties." (Hrg. Tr. at 17, 25). While the white Bonneville was stopped on Industrial Avenue, two other vehicles traveling north on Industrial Avenue had to stop and drive around it to proceed north. (Hrg. Tr. at 8-9). While Officer Beisel stated that it was a mutual decision to stop defendant's vehicle, he also indicated that it was primarily

his idea to make the stop. (Hrg. Tr. at 18). The officers waited for defendant to pull away from his parked position and then activated their lights and sirens to effect the stop. (Hrg. Tr. at 18-19).

Apparently, between the time the officers left their observation point along Industrial Avenue and the time they stopped defendant on Industrial Avenue, Officer Beisel stopped his vehicle and asked the unidentified man who had been speaking with defendant if the man knew defendant. (Hrg. Tr. at 8). The man told Officer Beisel that he did not know defendant. (Hrg. Tr. at 27). Officer Beisel could not recall which street he was on when he made contact with this unidentified man and did not note this contact with the man in his report or make any further inquiry of him because it was not "pertinent to the traffic stop." (Hrg. Tr. at 25, 27). Officer Beisel did not explain how asking the man if he knew defendant was "pertinent to the traffic stop."

According to Officer Beisel, defendant stopped his car and the officers approached the vehicle with Beisel approaching from the passenger side and Wilson from the driver's side. (Hrg. Tr. at 19). Beisel observed a "12 ounce Corona bottle" between defendant's legs that was "half empty" and Beisel said he retrieved it from the car after defendant put it in the center console. (Hrg. Tr. at 20-21). Beisel further testified that Officer Wilson removed defendant from the

vehicle and placed him in handcuffs before turning him over to Officer Beisel. (Hrg. Tr. at 22). Officer Beisel then searched defendant and seized "a bag of marijuana from his front waistband and a bag of marijuana from his front left jacket pocket." (Hrg. Tr. at 22).

The second witness called by the government was Officer Matthew Wilson. Officer Wilson said the two officers were parked along Industrial Avenue just south of York. (Hrg. Tr. at 31). He described the area as residential but said that there were no curbs on the street. (Hrg. Tr. at 32). He could not recall how the police cars were parked in relation to each other, but when asked to mark their positions on a map, he indicated that both cars were side-by-side on Industrial Avenue with his vehicle being closest to the edge of the street. (*See* Defendant's Exhibit 2, attached as Appendix 2).

Officer Wilson said the white Bonneville was stopped when he first observed it on Industrial Avenue, indicating on defendant's Exhibit 2 that it was located just north of York and south of Bundy. He apparently did not see the vehicle turn from York onto Industrial Avenue as Officer Beisel testified. Officer Wilson observed a man approach the white Bonneville as it stood in the street and the vehicle stayed at that location for two minutes. (Hrg. Tr. at 32). Officer Wilson did not have contact with the person who approached defendant's vehicle

and he also said the person was never close to Officer Beisel's car. (Hrg. Tr. at 33, 39). During those two minutes defendant's vehicle was stationary on Industrial Avenue, two other vehicles drove around the white Bonneville to continue their travel on Industrial Avenue. (Hrg. Tr. at 36). While Officer Wilson did not recall who made the decision to stop the white Bonneville, that decision was made and the vehicle was stopped after it had moved from where it had been observed by the officers, but before it had gone past Carpenter Road. (Hrg. Tr. at 32, 40). Wilson could not recall if the sirens were employed to stop defendant's vehicle. (Hrg. Tr. at 33). Once stopped, Officer Wilson went to the driver's side of the vehicle, asked to see the driver's license and related documents, and then observed a "12 ounce half full Corona beer bottle between the driver's legs." (Hrg. Tr. at 33). Officer Wilson said he was the one that removed the beer bottle from the car. (Hrg. Tr. at 34). Defendant was arrested for open intoxicants and placed in handcuffs immediately. (Hrg. Tr. at 34). Officer Wilson then searched defendant's car. (Hrg. Tr. at 35). A handgun was found under the driver's seat. *Id*. Defendant was given a ticket by Officer Wilson for "obstructing traffic." (Hrg. Tr. at 36). The ticket was given to defendant when he was in the cell block following the arrest. (Hrg. Tr. at 44).

The defense presented two witnesses during the hearing. Defendant testified on his own behalf and the defense also called Waverly Trouser as a witness. Mr. Trouser testified that, in November of 2007, he lived in a residence located on the corner of York and Industrial Avenue. (Hrg. Tr. at 48). He recalled an incident that had taken place at his residence during that month. The incident, as he recalled, involved a white car pulling into his driveway during one evening just as he was walking out of the house. (Hrg. Tr. at 49). At the time he came out of his house, he observed two police vehicles south of the residence on Industrial Avenue near Alma. (Hrg. Tr. at 51). The driver of the car that pulled into his driveway, a person he did not know, got out and came to where Mr. Trouser was standing and asked about a female that he apparently thought lived at that residence. (Hrg. Tr. at 50). Mr. Trouser asked the man to leave and, shortly after the man in the white car had left, at least two police cars pulled over the white car. (Hrg. Tr. at 52). Mr. Trouser did not see what happened after that because he went back into his house and he denied having any contact with police officers that evening. (Hrg. Tr. at 52, 56).

Mr. Trouser acknowledged that he had been drinking that evening, however, he denied being intoxicated. (Hrg. Tr. at 59). He conceded that his memory might have been impaired to some degree due to his drinking, but definitely recalled the

white car pulling into his driveway and definitely recalled the police pulling the car over after leaving his residence. (Hrg. Tr. at 59-60).

During his testimony, defendant said that, on the night in question, he had dropped off a passenger on Alma Street near Industrial Avenue, where he had observed two police vehicles, and then proceeded to drive north on Industrial Avenue until he came to the house where he recalled previously dropping off a female that he apparently was interested in seeing again. (Hrg. Tr. at 63-64). Defendant had seen the police again on a "side street" off Industrial Avenue before arriving at the house. (Hrg. Tr. at 66). He stopped at the house and, after he was told by a person (in court he identified Waverly Trouser as the person he spoke to) that the female did not live there, defendant left. (Hrg. Tr. at 64). Defendant said that he was at the residence for less than one minute. (Hrg. Tr. at 70). Shortly after pulling away from the house, he was stopped by Officers Wilson and Beisel. (Hrg. Tr. at 67). Defendant denied having an open bottle of beer between his legs but acknowledged there was an unopened bottle of beer on the floor of the car at the time he was stopped. (Hrg. Tr. at 69). He said that he was placed under arrest and taken to one of the police cars where he was given a ticket for open intoxicants and was told he would be released unless something was found in his car. (Hrg. Tr. at 67-68). When asked by one of the officers if he

had anything on him, he admitted that he had marijuana on his person. Defendant denied that the officers had found any marijuana on him during the search of his person before he had informed them of having it. (Hrg. Tr. at 68).

Defendant was taken to a lock-up facility and made a written statement. (Hrg. Tr. at 72). In that written statement, defendant said, among other things, that he had dropped off a friend on Alma Street and, while he was parked there, the "police rolled by" him. He also said that he left that location and turned the "same way the police went" and then pulled into a driveway "next" to where the "police were talking" to find "another girl." He said that he asked a man about the girl and received a negative response so he drove away and was then stopped by the police after driving "a little way." (*See* Government's Exhibit A, attached as Appendix 3).

## III. ASSESSMENT OF EVIDENCE

The government bears the burden of proof with respect to the facts that would be necessary to establish, by a preponderance of the evidence, that there was a proper basis to stop defendant's vehicle. The government's evidence in this case consisted of the testimony of two police officers who were working together in November of 2007, and whose efforts resulted in the seizure of a handgun from defendant's vehicle. As indicated above, the two government witnesses gave

conflicting versions of the events in question. While some of the differences were not of great consequence, such as whether Officer Beisel's car or Officer Wilson's was located closest to the edge of Industrial Avenue, there were numerous such inconsistencies that, when viewed in the aggregate, left the undersigned with a great deal of uncertainty as to the events that were relevant to this matter. The inconsistencies included the circumstances associated with the initial recognition of the white Bonneville, the location of the police vehicles when they first observed defendant's vehicle, the description of the road where the stop took place, which officer actually seized the beer bottle in defendant's car, as well as others. Additionally, neither officer testified with a demeanor such that confidence in their testimony was established.

The defense evidence, while not without weakness, contained a fundamental consistency that made it believable. Shortly after his arrest, defendant made a written statement of the events that was consistent with his testimony at the hearing conducted a number of months after the written statement was created. While it might be argued that individuals facing criminal charges have a bias to say certain things that would be self-serving, there is nothing to suggest that defendant would have recognized, immediately after his arrest, the self-serving nature of saying that he pulled into a driveway to ask about a female, as opposed

to stopping in the street to inquire about that subject. Additionally, and perhaps most importantly, the testimony of Waverly Trouser was consistent with the written statement of defendant as well as defendant's hearing testimony. Mr. Trouser had no motive to fabricate his testimony regarding the events that transpired near his home in November of 2007. He did not know defendant nor have any other apparent interest in the outcome of this case. He acknowledged that he had been drinking that evening but denied that he was intoxicated and expressed certainty about some of the critical events that are at issue here. His testimony was matter-of-fact and lacked any indication of intent to falsify.

Based on the evidence presented at the June 12, 2008 evidentiary hearing,[3] the undersigned concludes that the government has not met its burden of proving

---

[3] Defendant has renewed his request to admit a portion of the police report created following the incident in question. Defendant argues that it should be admitted in that the rules of evidence do not apply to a hearing on a motion to suppress. Defendant's request is again denied. Regardless of the application of the rules of evidence to hearings such as that conducted in this case, the issue is that there must, at some point, be a termination of evidence presented and thereafter it is improper to continue to receive evidence. The receipt of evidence ended with the conclusion of the hearing on June 12, 2007, and the undersigned believes that it would be improper to now admit additional evidence in the absence of a stipulation. It should be noted that the proffered police report has been reviewed and, if it had been admitted, the undersigned would have reached the same conclusion.

by a preponderance of the evidence that probable cause, or a reasonable suspicion, existed to believe defendant obstructed traffic on November 26, 2007.

IV.  **VIOLATION OF FLINT CITY ORDINANCE**

While it is, perhaps, unnecessary in light of the above assessment of the evidence in this case, in the interest of completeness, the undersigned will address the application of the Flint city ordinance section that the government contends was violated in this case which, according to the government, was the basis for the traffic stop of defendant that led to the seizure of the firearm defendant is charged with possessing. In its objection to the magistrate judge's report and recommendation (Dkt. 24), the government stated that the section of the Flint City Code violated in this case was § 31-55, which provides as follows:

> No person, without authority, shall loiter, linger, stay, saunter, delay or stand around, or do any other act so as to block, obstruct, impede or otherwise interfere with the normal flow of vehicular or pedestrian traffic upon any public street or highway, sidewalk or any other public place or public building or an business lawfully conducted by anyone in or upon such public street, highway, public sidewalk or other public place or public building, by means of a barricade, object or device, or with his person, all or any of which prevents the free and uninterrupted ingress, egress and regress therein, thereon or thereto. This section shall not apply to persons maintaining, rearranging or constructing public utility facilities in or adjacent to a street or sidewalk, nor shall it

apply to persons peacefully picketing upon places other
than a public street or highway.

This provision of the City Code, contained in General Offenses section, rather than Motor Vehicles and Traffic section, does not appear to be a civil infraction, given that § 1-11 states that a code violation is a misdemeanor unless specifically designated a civil infraction. Section 1-20 designates certain code sections as civil infractions and the list of violations so designated does not include § 31-55. If this was the Flint City Code section on which Officers Beisel and Wilson acted when they stopped defendant, they were mistaken in believing it was a civil infraction.

Additionally, it appears that this code section does not apply to the operation of motor vehicles. The operative language of the section is "[n]o person ... shall loiter, stay, saunter, delay or stand around, or do any other act so as to block, obstruct, impede or otherwise interfere with the normal flow of vehicular or pedestrian traffic ... by means of a barricade, object or device, or with his person ..." To violate this section, someone would have to use their "person" to create the obstruction or use a "barricade, object or device." Interpreting this section of the code under the canon of *ejusdem generis*, which requires that general words are "'construed to embrace only objects enumerated by the preceding specific

words,'" it does not seem as though a motor vehicle can be favorably compared to a "barricade." *United States v. Veach*, 455 F.3d 628, 636 (6th Cir. 2006). As a result, this section of the Flint City Code does not appear to apply to any conduct engaged in by defendant on November 26, 2007.

## V. RECOMMENDATION

Based on the foregoing, it is again **RECOMMENDED** that defendant's motion to suppress be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response must not exceed 20 pages in length unless such page limit is extended by the Court. The response must address specifically, and in the same order raised, each issue contained within the objections by motion and order. If the Court determines any objections are without merit, it may rule without awaiting the response to the objections.

Date: December 16, 2008                    s/Michael Hluchaniuk
                                           Michael Hluchaniuk
                                           United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on <u>December 16, 2008</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Nancy A. Abraham and Kenneth R. Sasse</u>.

                                           s/James P. Peltier
                                           Courtroom Deputy Clerk
                                           U.S. District Court
                                           600 Church Street
                                           Flint, MI 48502
                                           (810) 341-7850
                                           pete_peltier@mied.uscourts.gov